15-1640 U.S. Ethernet Innovations v. Acer 15-1640 U.S. Ethernet Innovations v. Acer, Inc. 15-1640 U.S. Ethernet Innovations v. Acer, Inc. This issue in this case can be decided reading the first column and a half of the patent. There's two types of prior art buffers that are referenced. The first is a transmit data buffer that's expressly described as a buffer that stores data such that if there's a transmission error, the buffer doesn't have to go back to the host to re-download the data and start all over again. Tell me why I'm wrong. I did not read that column as defining all transmit buffers as having that storage capacity, but rather referring to some set of buffers that have that capacity without saying that all of them do. Correct. I think it's noting that it is an advantage of a transmit data buffer. I have not made myself clear. Because of the absence of a definite article, a number quantifying article, it doesn't say in the prior art all dedicated transmit buffers have this storage capacity, but they are deficient. It says some network adapter interfaces include dedicated transfer buffers into which a frame can be stored. That doesn't say that all of the prior art dedicated transfer buffers have that property. I'm not sure that it's a distinction that merits a difference here. The reason I say that is because the noted advantage of the transmit data buffer was the ability to store the data. That was the advantage that the invention was trying to incorporate. That's noted in the summary of invention. It's trying to maximize the advantage of the transmit data buffer, the storage element, so if there's an error in transmission, it doesn't have to go back to the host to redownload it. That was the express advantage of this invention. The disadvantage of the transmit data buffer was that it had to wait until all of the data of the frame was transmitted into the buffer. There was a latency issue. The district court confused that downloading of the data so it didn't have to go back to the host to download it again. Do I take it that because you're starting with the description of the prior art, you don't really see much room for making an advance toward your position on the claim language? I think the claim language is instructive. I do. But I think before we get to the claim language, I think it's important, as a PCETA would do, to review what the prior art looked like in the specification. We're starting expressly in the intrinsic record. The intrinsic record talks about the advantages and disadvantages of the transmit data buffer, column one. The advantages and disadvantages of FIFO buffer. The advantage being it was faster. It had throughput. The data came in and flowed out. The disadvantage was that data was not stored locally. It was unloaded is the term that's used in column one of the patent. In other words, if there was a transmission error, the FIFO buffer had to go back to the host, redownload the data, and start all over again. Does claim one require the ability to make a second attempt at transmission if the first fails? No, but it does require the ability of the buffer to store the data for transmission. But the claim doesn't talk about storing frames of data. That's correct. It's talking about storing data. Not necessarily a complete frame.  For successful transmission to occur, for this frame of data to be transmitted, it had to go through 64 bytes. That's called the collision window. There's testimony from all three inventors in our brief that talk about this collision window. There's testimony from the experts that talk about the collision window, the first 64 bytes. As long as it gets through that, the likelihood of a collision goes way down and successful transmission occurs. There's no requirement that the buffer store all 64. I believe the patent language to successfully transmit, it would have to have the first 64 bytes so it didn't have to go back to the host to redownload the data. Maybe that's in the descriptive materials, but I'm talking about the claim. Our view is the claim language storing data for transmission requires the element of the transmit data buffer to have that data locally to ensure transmission. So it doesn't have to go back to the host computer and interrupt it. For that construction, you rely on isolated places in the specification. There are multiple quotes in the specification, including the summary of invention, which talks about this being a transmit data buffer. But they talk about having resonant on the adapter the entire frame of data. This isn't a case where there's paid experts on both sides coming up with different conclusions. There are 10 positas in this record who have come out and said, we read this patent specification. We read the claim language. It's our understanding that you have to store a frame of data on the adapter. Didn't we say in the remand decision in Teva, basically following what the Supreme Court had said in Teva, that the fact that an expert says in what by definition is extrinsic evidence because it's newly created, it says here's how I interpret the intrinsic evidence, that doesn't make that into a fact question. Fact questions are questions about facts external to the patent. Like when we in the MIT or Harvard computer science department use this language, this is what we mean. So it probably has that meaning in the patent. But is any of the expert testimony here about the interpretive question of that sort or is it all, I've read all many columns of the patent and the claims and this is how I would interpret it. That's not the kind of expert testimony that turns it into a fact question. We don't disagree with Your Honor's reading of Teva. The point we would make is it's the second prong of the anticipation analysis. What evidence is there that a poseda would understand this sonic device to read on the claim language? So that is a quintessential fact question. And the facts here are we have 10 posedas. But before we get that, we have to determine whether the claim language means what it says you say it means or what your friend says it means. And the expert testimony about whether this part reads on it or not is irrelevant to that question, isn't it? I agree that it is less relevant to the legal question. Yes, it's less probative I believe is what the court's holdings are. But despite that, I think the fact question here, this was granted, anticipation was granted on summary judgment in California. What we're saying is there was demonstrative weight of evidence showing that the fact question should be resolved in our favor. The only witness to come forward and offer a different conclusion was Dr. Wicker, a paid expert for the defense. And Dr. Wicker didn't review in his opinion in detail the language of the specification, the requirements of the transmit data buffer, the advantages of the transmit data buffer. That was given very cursory review when it was compared to the storing data frames requirement in the claims in comparison to the sonic reference. So we think given the weight of that evidence... Can I ask a clarification of, and the question itself may be confused, but is your view that the claim language has to be read so that the buffer can hold an entire frame, full stop, or more aggressively, an entire Ethernet frame? So that if you didn't have an Ethernet, am I right, the claim doesn't refer to Ethernet, is that right? Not directly in the claim language. So if you had a protocol that had 32 byte frames, it still might require a storage of, that the buffer be at least 32 bytes big plus whatever else it needs to hold the 32 bytes, but that still wouldn't be enough for you. You need to get it into the 64 byte range, is that right? The language in column one is it requires storage for successful transmission. Under the Ethernet standard, that's 64 bytes. You need to read Ethernet standards into this claim? We think that the patent is focused squarely on Ethernet, although it doesn't appear directly in the claim language, the specification is replete with Ethernet. But the important point from our point of view on anticipation is, there's no dispute that the sonic doesn't store at all. The sonic unloads data. So if there's an error, it has to go back to the host where the memory is to redownload the data and start all over again. So this ephemeral temporary storage the defendants call about, in reality, the data is not there. It's unloaded out of the sonic. And that's described pretty clearly as a disadvantage of a FIFO in column one of the specification. And that concept never made it into the district court. The glaring error, and it was a misportrayal of the technology that the district court accepted, was that the sonic FIFO unloads, stores data in the same way that the transmit data buffer stores data. And that is incorrect. The transmit data buffer hasn't resident locally on the adapter so that it didn't have to go back to the host. The FIFO unloads the data so it does have to go back to a host. And that created enormous performance problems in the FIFO. And the record has numerous testing, both by defendants here and by 3Com, showing the superior performance of this product. It increased by well over 100 percent compared to the prior order. And it sold as a result, over $2 billion worth of this product was sold. Into your rebuttal time, I don't know whether you want to use it now or save it. I'll reserve it. Thank you, Your Honor. Mr. Stevens? Yes, Your Honor. Good morning. We heard a lot about various advantages that are described in the description of the prior art. Can you actually start there? Sure. How in your view, in a way that I might be able to understand, does this claim identify some advance over the particular prior art described in the background section? As having disadvantages, if you're right in your view about the claim scope? Certainly, Your Honor. So the claims refer to monitoring the transfer of data into a buffer memory in order to make a threshold determination based on an amount of data that's been transferred. When we get this amount, we're going to start sending it along? That's correct, Your Honor. That's why they call them the early transmit patents. That is not described in the background section that discusses the prior art in column one at all. But it is disclosed in the sonic data sheet, which is not cited prior art. And the reason it's not disclosed is that the FIFO system uses no thresholds at all? Is that right? Not at all, Your Honor. So it goes in one end, it comes out the other. First in, first out. And no threshold is required to use a FIFO to buffer in that way. So the invention, as described in the summary of the invention, and as claimed in all the claims in the 872 patent, include this threshold determination. And that isn't discussed anywhere in the prior art section of the patent. However, it is disclosed in the data sheet for the sonic. And we know that the data sheet for the sonic was not before the examiner because it's not cited on the front of the patent. Nor does it appear anywhere in the file history. So it appears that whoever wrote the patent just didn't understand because they didn't have the description of the sonic that discloses the threshold determination and the early initiation of transmission that is clearly set forth in the sonic data sheet. So they claimed that, even though that doesn't distinguish the sonic. And what they described in the prior art for FIFOs was a more conventional system where data just went in one end and came out the other. And you began transmitting when the FIFO was full instead of before the FIFO was full. And in fact, if you look at the claim language of claim one of the 872 patent, which is reproduced in our brief, you'll see that the phrase data of frames as used in the claim, and in the particular phrase that Mr. Herman refers to, must refer to less than all of the data of the frame precisely because of this threshold determination that happens. So we see first the buffer memory for storing data of frames in the first clause. And of course there was an agreed construction below that buffer memory means a memory for temporary storage of data. So there's no dispute that that buffer memory stores data. And there's also no real dispute that all the data that goes through that FIFO is frame data that's to be transmitted. That's clearly disclosed in the sonic as explained by the defendant's expert below. So then you look further down the claim, and you see the means for monitoring the transferring of data of a frame to the buffer memory to make a threshold determination of an amount of data of the frame transferred to the buffer memory. That's at line 15 of column 30. The next phrase refers to a means that's responsive to the threshold determination of the means for monitoring for initiating transmission of the frame prior to transfer of all of the data of the frame. So we know that when the claim uses the phrase data of the frame, it's referring to less than all of the data of the frame. And when the claim means all of the data of the frame, those are the words that it uses. That same kind of distinction is also found in the description of the prior art itself. So if you look at column one, you see around line 49 a description of downloading data of a frame into the FIFO. So as Mr. Herman says, these FIFOs could not hold an entire frame. So when the patent talks about data of a frame being stored in a buffer memory, it's talking about less than all of the data of a frame. And when it's referring to an entire frame of data, as you see around line 40 in column one, that's what it says. It says the frame is stored in the transmit data buffer. So again, there's no real issue here. So just say again, what do you think under your view of the claim the advantage would be over a FIFO system? The advantage, Your Honor, is it doesn't have to wait until the FIFO is full to begin transmission. Is there something in column one that says FIFOs wait until the buffer is full before? That was the other one. This is where it starts talking about unloading the FIFO during a transmission. This again is around line 47, I guess. First in, first out FIFO systems in which the sending system downloads data of a frame into the FIFO while the network adapter unloads the FIFO during a transmission. So it goes in one end and it comes out the other. Whereas the SONIC, like the claims, monitors the downloading and when a threshold has been met, it begins transmitting. I think I'm just going to go over old ground, but I'm still confused. The background section, this two-thirds of a column or something, describes two different kinds of prior art. One, not the FIFO, says you put stuff into a buffer, you have to wait until it's all there before you send it along. The problem with that is it delays transmission. Now let's talk about FIFO. Forget about the first thing for a minute. Under your view of the claim, what is the advantage over the FIFO system as described in column one? So the advantage of the SONIC system and what's claimed is that it does not need to wait until the FIFO is full. Where in column one does it describe the FIFO system as delaying its sending along until the FIFO buffer is full? It does not say that, Your Honor. But it also does not mention this threshold ability which is claimed and described in the summary of the invention and also in the SONIC data sheet. So it's not described in the description of the prior art, I believe, because the prosecuting attorney simply didn't realize that the advantage that it was talking about in the summary of the invention was actually present in the SONIC. If they'd known that, presumably they would have cited the data sheet, for example, to the examiner and would have claimed something different. Was there other evidence that described how FIFO systems worked? Oh, yes. The experts for the defendants below put in a very extensive report describing in detail how FIFO systems work and explaining how the SONIC did something different then. Can you point me?  What's the name of the expert? Wicker. Well, he was hired by the defendants, as experts typically are hired by one side or the other. I would like to mention briefly the discussion that Mr. Herman had about all the various advantages that are described in the prior art. And, of course, this court has held in Phillips that the fact that the written description sets forth multiple advantages doesn't mean that the claim has to have all of those. And, of course, the claim language here is conspicuously missing most of the things that Mr. Herman describes as advantages. None of the claims recite the word Ethernet. None of them recite a transmit data buffer or a dedicated transmit buffer, which is discussed here in the background section. And, in fact, when the patent prosecutor wanted to claim various different features of the buffer memory, he did so in various other claims. So, for example, Claim 7 says wherein the buffer includes a transmit descriptor and other characteristics. Those are not found in Claim 1. So the prosecutor was perfectly capable here of including various structural limitations of the kind that Mr. Herman would have the court read in, but chose not to include those in the claims that are at issue before the court today. Your Honor, the file history also includes a relevant portion here. There was a Rule 131 inventor declaration filed, and this was in the record below, and it's referenced at 9376 in the joint appendix. The inventor said to the patent office, of course, to overcome a prior art reference, that a buffer memory storing a number of bytes of a packet that is storing data of frames as recited by the claim. So the inventor said to the patent office during prosecution that storing data of frames as recited by Claim 1 was simply storing a number of bytes of a packet. And so we would suggest that the intrinsic evidence here is very clear, and it does not require storage of an entire frame or any of the other benefits that Mr. Herman suggested like retransmission. If the court has no other questions, I'll sit down. Thank you.  Thank you, Your Honor. I think, Your Honor, put your finger on the exact issue. There were two advantages, one for a FIFO, one for a transmit data buffer. The advantage of the FIFO was the throughput. It hit the buffer and went immediately out. It was not stored locally on the buffer, so it was fast. What does the record tell us about, I mean, I guess as a non-expert here, I'm imagining sort of two, and I think maybe I've even heard, two different descriptions. One is first in, first out, even before the FIFO is filled, FIFO buffer is filled, and the other is wait until it's filled and then it just goes out the back end and it's never to be heard from again. What does the record tell us about those two possibilities being under the FIFO label as it's used in Column 1 or anything else? It's a highly technical issue that I'm not sure bears on the outcome, but my understanding is that the FIFO would speed match the speed of the output, so the data would flow through based on how quickly it could leave the buffer. So it doesn't get blocked at the entrance? Correct. So the point is, it was not stored. The patent describes a Column 1 as being unloaded, so if there's a transmission error, it's not there in the FIFO. That was the disadvantage. The advantage of the transmit data buffer, the advantage they don't want to talk about, and Your Honor correctly pointed this out, was that it did store. So if there was a transmission error, it didn't have to go back to the host, it was stored locally, it could go retransmit out of the buffer. Was there any evidence in the record about the range of technical functionalities of FIFO that said some of them start the exiting when, I assume in the FIFO there is a buffer, right? Is it some kind of buffer or no? It is a buffer. So when it is half full, when it is completely full, regardless, as soon as the first byte comes in, that first byte is going out the exit, or some FIFO systems, I guess I'm imagining the possibility of what feels, at least conceptually, like it might be helpful evidence to you. Some FIFO systems, called FIFO systems, allowed the user or somebody to set when the exit started. And I think that's right. I think there was an ability to say, okay, when you get 8 bytes... My question specifically, is there something I can look at in the record that says that? I believe the sonic data sheet talks about being able to set a number when the bytes start to leave. But the point is, they're not stored there for successful transmission. They don't meet the claim language. If there is a problem in the transmission, it doesn't have the advantage of a transmit data buffer being stored locally. So even though they may be there, they're not in a memory format like a transmit data buffer that allows the adapter to go ahead and retransmit it. The advantage was the storage, the storing, the claim element was storing the data, the frames. This issue was considered by two previous courts and two previous juries. And they all found our way. Speaking of two courts, why don't we wrap this argument up and move to the next one.